# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MICHELLE A. CLINE, )
                                              )
    Claimant Below-Appellant, )   C.A. No. N22A-11-003 FWW
                                              )
        v. )
                                              )
THE NEMOURS FOUNDATION, )
                                              )
    Employer Below-Appellee. )

Submitted: July 27, 2023
Decided: October 11, 2023

## MEMORANDUM OPINION

*On Appeal from the Industrial Accident Board:*
**REVERSED and REMANDED**

Jessica Lewis Welch, Esquire, DOROSHOW, PASQUALE, KRAWITZ & BHAYA, 1208 Kirkwood Highway, Wilmington, Delaware 19805, Attorney for Appellant Michelle A. Cline.

Keri L. Morris-Johnson, Esquire, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, 1007 N. Orange Street, Suite 600, P.O. Box 8888, Wilmington, Delaware 19899, Attorney for Appellee The Nemours Foundation.

**WHARTON, J.**

## I. INTRODUCTION

Michelle A. Cline ("Cline") filed a Notice of Appeal on November 14, 2022 seeking a review of the October 13, 2022 decision by the Industrial Accident Board ("Board"), mailed October 17, 2022. Cline contends that the Board erred when it denied her Petition for Additional Compensation, concluding that she was not entitled to additional compensation for total knee replacement surgery.

In this appeal, Cline asks the Court to determine whether the Board committed legal error, or abused its discretion, by failing to apply the proper legal standards as set forth by the Delaware Supreme Court and incorrectly applying the Delaware Healthcare Practice Guidelines ("Guidelines") in its application of 19 *Del. C.* § 2322. She also asks the Court to determine whether the Board's decision that her medical treatment was not reasonable and necessary was supported by substantial evidence. Specifically, Cline asks the Court to consider whether the Board failed to make an individualized determination of the reasonableness of her treatment under *Brittingham v. St. Michael's Rectory,*[1] and whether it misinterpreted the Guidelines as requiring the "exhaustion of conservative treatment" rather than the "exhaustion of all reasonable conservative treatment" before a knee replacement is reasonable. She also asks the Court to consider whether the Board's decision to accept the opinion of her employer's expert medical witness, Dr. Eric Schwartz ("Dr.

_____

[1] 788 A.2d 519 (Del. 2002).

Schwartz"), rather than the opinion of her treating physician, Dr. James Rubano ("Dr. Rubano"), was supported by substantial evidence. After considering the three relevant paragraphs of the Board's decision regarding the legal standard it applied and the factual support for its decision, the Court concludes that it is unable to say with confidence that the Board's decision is free from legal error and supported by substantial evidence. Specifically, the Court is unable to conclude that the Board considered whether "all *reasonable* conservative treatment had been exhausted" as to Cline's treatment specifically and not generally as to anyone in her position. Further, since the Board's decision is almost totally conclusory, the Court cannot say that the Board's determination that Cline's total knee replacement surgery was not reasonable and necessary was supported by substantial evidence. Therefore, the Court finds that the Board's decision was not free from legal error and was not supported by substantial evidence. Accordingly, the Board's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Opinion.

## II. FACTUAL AND PROCEDURAL CONTEXT

Cline has appended a Joint Stipulation of Facts for the hearing before the Board on September 23, 2022 to her Opening Brief on appeal.[2] That Stipulation simply recites, in pertinent part, that: (1) Cline sustained a compensable work related

---

[2] Stip. of Facts, App. to Op. Br. at A1., D.I. 13.

3

injury to her right knee while in the course and scope of her employment with Nemours; (2) as a result of her injuries, she underwent a total right knee replacement surgery with Dr. Rubano on May 17, 2021; and (3) she was paid total workers' compensation benefits until her return to work following surgery.[3] The Board set out the procedural posture of the case as well as a detailed summary of the evidence presented at the hearing before the Board on September 23, 2021 in its decision.[4] Since neither party takes exception to the Nature and Stage of the Proceedings or the Summary of the Evidence set out in the Board's decision, the Court accepts them.[5]

On March 15, 2021, Cline sustained a compensable injury to her right knee while she was working for Nemours when a pediatric patient kicked her in the knee and punched her in the face.[6] Two months later, on May 17, 2021, Dr. Rubano performed a total knee replacement surgery to treat her right knee injury. Cline filed a Petition for Additional Compensation on January 31, 2022 seeking acknowledgment of the compensability of the total knee replacement surgery.[7] Nemours disputed the reasonableness, necessity and causal relationship of the surgery to the work injury.[8]

---

[3] *Id.*
[4] *Cline v. Nemours Foundation,* No. 1509418, at 2-9, (I.A.B. Oct. 13, 2022), App. to Op. Br. at A112-22, D.I. 13.
[5] *Id.*
[6] *Id.* at 2.
[7] *Id.*
[8] *Id.*

The Board held a hearing on September 23, 2022.[9] At the hearing, Cline presented the deposition testimony of Dr. Rubano, a board certified orthopedic surgeon with a subspeciality in hip and knee replacement surgeries, who is also a certified provider under the Delaware Workers' Compensation Healthcare System.[10] Dr. Rubano opined to a reasonable medical probability that the total knee replacement was reasonable and necessary.[11] He testified that Cline had a medial meniscus tear and arthritis, and that, while the meniscal tear could have contributed to Cline's pain, her arthritis was the primary pain generator.[12] Were it not for the work injury, Cline's arthritis would not have become symptomatic.[13]

Dr. Rubano testified that he began treating Cline on April 9, 2021.[14] He reviewed reports and films of X-rays and an MRI and felt that both reports downplayed the extent of Cline's arthritis.[15] In his opinion, the X-rays demonstrated arthritis in the patella femoral joint and the MRI demonstrated moderate to severe arthritis, particularly underneath the kneecap, under the patella femoral joint.[16] Cline had a meniscal tear and advanced medial and lateral arthritic changes underneath the

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* at 3.

5

kneecap.[17]  Dr. Rubano added that a direct trauma or blow to the knee can cause the kneecap to impact against the femur and exacerbate or accelerate arthritis or post-traumatic arthritis.[18]  With Cline, the injury accelerated her preexisting asymptomatic arthritis requiring the treatment he performed.[19]

When Dr. Rubano first saw her, Cline was having significant difficulty performing her activities of daily living.[20]  She had tried to return to light duty after the injury, but her knee gave out, causing her to nearly collapse.[21]  Dr. Rubano's notes from Cline's initial appointment indicated that she had tried conservative interventions such as taking time off from work and taking anti-inflamatories.[22]  He discussed with her various treatment options, including conservative care and surgery.[23]  In Dr. Rubano's view, conservative treatments such as injections, anti-inflamatories, and physical therapy would not provide a long term solution.[24] Conservative care also would not address Cline's arthritis, her primary pain generator.[25]  Similarly, arthroscopic surgery would only address pain from the meniscal tear, whereas, a total knee replacement would address both the arthritis and

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at 4.
[24] *Id.*
[25] *Id.*

the meniscal tear and give Cline the best chance of full pain relief and of returning to work in a timely fashion.[26] After surgery, Cline returned to her job as a nurse without restrictions.[27]

Dr. Rubano acknowledged that he did not administer any conservative treatment to Cline and that when Cline first visited him, he was not able to determine whether the meniscal tear or the arthritis was the cause of her pain.[28] Dr. Rubano did dispute Dr. Schwartz's opinion that the mechanism of Cline's injury would not have produced the fold slap tear of her medial meniscus.[29] He explained that the fold slap tear could not be dated and could have preexisted the work injury.[30]

Cline testified as well. She testified she is 51 years old and works as a pediatric nurse in the Pediatric Intensive Care Unit.[31] She has been a nurse for almost 31 years and at Nemours for 14 years.[32] She believes the patient who punched her in the face and kicked her in the knee to be about 13 or 14 years old.[33] She typically works 12 hour shifts, mostly on her feet.[34] Her job can be strenuous and requires

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.* at 5.
[32] *Id.*
[33] *Id.*
[34] *Id.*

lifting.[35]  There are no light duty jobs available.[36]  She also teaches nursing as a side job and watches her two year old granddaughter.[37]

After her injury, she treated at Med Express for right knee pain.[38]  She tried to continue working, but eventually, her knee started to collapse, preventing her from working.[39]  Between March 15, 2021 and April 9, 2021, she was on total disability.[40]  She self-treated with ice, Motrin, and rest.[41]  Light therapeutic exercises at home only increased her pain.[42]  She was unable to stand for prolonged periods, sat in a chair to cook and wash dishes, and relied on a seat when showering.[43]  Driving more than 30 minutes was too painful and she stayed on the first floor of her house because she was unable to use the stairs.[44]

When she first saw Dr. Rubano, he discussed several treatment options, including exercises, several types of injections, physical therapy, arthroscopic surgery, and total knee replacement surgery.[45]  In discussing the treatment options, he was of the opinion that neither conservative treatment, nor arthroscopic surgery

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*

would help because they would not address her arthritis.[46]  She felt she needed to return to full duty work because Nemours would replace her job if she was out four to six months.[47]

After discussing her options with her husband and doing additional online research, she decided to proceed with a total knee replacement surgery because she concluded that the more conservative options would not work or, in the case of arthroscopic surgery, only be a temporary solution.[48]  She disputes a note in Dr. Rubano's records that a pre-surgical injection provided her with immediate pain relief, testifying that she does not recall any relief from the injection.[49]  She concluded that a total knee replacement would provide her with the greatest chance of timely returning to work without restrictions.[50]

Cline was able to return to work full time in August 2021 after surgery.[51]  She was very happy with the full knee replacement surgery.[52]  Her knee feels amazing and she was able to return to nearly all her activities of daily living, including

---

[46] *Id.* at 5-6.
[47] *Id.* at 6.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*

navigating stairs and running.[53]  While kneeling continues to be problematic, otherwise, she essentially is pain free.[54]

Dr. Schwartz testified by deposition for Nemours.  Like Dr. Rubano, he is board certified in orthopedic surgery and a certified provider under the Delaware Workers' Compensation Healthcare System.[55]  Although, unlike Dr. Rubano, he has not performed a knee replacement surgery in 10 or 15 years.[56]  He examined Cline on September 21, 2021.[57]  Dr. Schwartz questioned the causal relationship of the replacement surgery to the injury, explaining that it would be unusual for a kick in the knee by a pediatric patient to result in a significant meniscal tear.[58]  He further believes that the mechanism of the injury would not have aggravated arthritis to cause it to become symptomatic.[59]

Apart from causation, Dr. Schwartz opined that total knee replacement surgery was neither reasonable, nor necessary.[60]  In his view, the "rush" to surgery, either arthroscopic or total replacement, did not comply with the Guidelines, Medicare Guidelines, or Highmark of Delaware Guidelines because all three

---

[53] *Id.*
[54] *Id.*
[55] *Id.* at 6-7.
[56] *Id.*
[57] *Id.* at 7.
[58] *Id.*
[59] *Id.*
[60] *Id.*

guidelines call for exhaustion of conservative treatment and documented limitations.[61] There was no evidence Cline had significant long term pain and no documentation of how her quality of life was being limited.[62]

Dr. Schwartz explained that conservative treatment includes nonsteroidal anti-inflamatories, therapeutic injections such as Cortisone injections, supervised physical therapy, muscle strength exercises, use of assistive devices, and weight reduction, none of which Cline underwent.[63] Merely talking about conservative options, as appears to be the case here, is not sufficient to comply with the Guidelines.[64] Dr. Schwartz testified that it was very likely that conservative treatment could return a person to a pre-injury level of function and activity.[65] In his opinion, Cline should have been given time to get well.[66]

Dr. Schwartz further explained that Cline's X-rays were essentially normal and an April 2, 2021 MRI identified a medial meniscal tear, mild degenerative changes, not apparent on the X-rays, a mild lateral patella tilt, and diffused left and

---

[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.* at 7-8.
[66] *Id.* at 8.

11

50% thickness loss, none of which were significant.[67] Total knee replacement requires severe degenerative joint disease, which was not present here.[68]

Dr. Schwartz acknowledged that Cline's arthritis predated her work injury and that it had been asymptomatic up until the injury.[69] He also acknowledged that a trauma could cause an asymptomatic condition to become symptomatic.[70] On cross-examination, Dr. Schwartz admitted that he did not review the films from the X-rays or the MRI, only the reports.[71] He was also unaware that there was a strict timeframe for Cline to return to full-duty work to maintain her employment.[72] Nor was he aware that Cline had attempted to return to work before her surgery, but was unable to do so because her knee gave out.[73] Finally, Dr. Schwartz acknowledged that the Guidelines are merely advisory and that treatment must be tailored to the individual patient and not rendered to fit general scenarios.[74]

Based on the totality of the evidence presented, the Board found that proceeding to total knee replacement surgery without exhausting conservative care was not reasonable or necessary.[75] In doing so, it accepted the medical opinions of

---

[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.* at 8-9.
[73] *Id*. at 9.
[74] *Id.*
[75] *Id.* at 10.

12

Dr. Schwartz over those of Dr. Rubano.[76] In particular, it accepted Dr. Schwartz's testimony that a "rush" to surgery would not comply with the Guidelines, the Medicare Guidelines, or the Highmark of Delaware Guidelines because all three guidelines call for "exhaustion of conservative treatment and documented limitations."[77] The Board acknowledged that the Guidelines are merely guidelines, but found that Cline should have pursued some type of conservative treatment first.[78]

The Board concluded Dr. Rubano rushed the full knee replacement surgery.[79] The Board was concerned that neither the reports from the X-rays, nor from the MRI identified significant arthritis, yet Dr. Rubano testified that his review of the MRI films identified moderate to severe arthritis.[80] Further, his incorrect statement in his medical records that Cline had exhausted conservative treatment when she had not detracted from his credibility.[81] Further, Dr. Rubano's records did not sufficiently support a diagnosis of severe degenerative joint disease, a requirement for total knee replacement in Dr. Schwartz's opinion.[82] Finally, the Board appreciated Cline's

---

[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.* at 10-11.

need to return to full-duty work, but found that it was not reasonable or necessary to rush to undergo a total knee replacement surgery.[83]

### III. THE PARTIES' CONTENTIONS

Cline contends that the Board's decision should be reversed because the Board committed legal error or abused its discretion and because its finding that her total knee replacement surgery was not reasonable and necessary was not supported by substantial evidence. First, Cline contends that the Board committed legal error when it failed to address and apply the standards set forth in *Brittingham v. St. Michael's Rectory*.[84] In particular, the Board failed to decide whether the treatment was reasonable for Cline specifically by considering and analyzing various factors including her age, prior surgical experience, general physical condition, likelihood of success of the treatment, risk of worsening of the condition, or risk of death from the offered treatment.[85] Further, the Board incorrectly applied the standards set forth in the Guidelines.[86] The Board failed to give effect to the Guidelines' statement that services rendered by any Delaware workers' compensation certified medical provider, which Dr. Rubano is, "shall be presumed, in the absence of contrary evidence, to be reasonable and necessary if such treatment and/or services conform

---

[83] *Id.*
[84] Op. Br. at 25 (citing *Brittingham v. St. Michael's Rectory*, 788 A.2d 519 (Del. 2002), D.I. 13.
[85] *Id.* (citing *Brittingham,* at 524-25).
[86] *Id.* at 28.

14

to the most current version of the Guidelines."[87]  Deviations from the Guidelines may be acceptable, however.[88]  The Guidelines specifically identify that total knee replacement is reasonable when there is "severe osteoporosis and all reasonable conservative measures have been exhausted and other reasonable surgical options have been considered."[89]  The Board incorrectly applied that standard when it held the Guidelines require the "exhaustion of conservative treatment," not the exhaustion of all *reasonable* conservative measures as the Guidelines require.[90]

Second, Cline contends that the Board's conclusion that Cline's total knee replacement was not reasonable and necessary is not supported by substantial evidence.[91]  Cline challenges the Board's determination to accept the opinion of Dr. Schwartz over that of Dr. Rubano.[92]  Specifically, she contends that Dr. Schwartz's opinion was invalid because it lacked a factual foundation[93] and was contradictory and inconsistent regarding Cline's diagnosis and treatment.[94]  Finally, Dr. Rubano's opinion regarding Cline's diagnostic films was uncontradicted.[95]

---

[87] *Id.* at 28-29 (quoting 19 *Del. C.* 2322C(6)).
[88] *Id.*
[89] *Id.* at 29 (quoting Delaware Healthcare Practice Guidelines, 19 *Del. Admin. C.* § 1342-7.4.5).
[90] *Id.*
[91] *Id.* at 32.
[92] *Id.* at 33-44.
[93] *Id.* at 34-38.
[94] *Id.,* at 39-41.
[95] *Id.* at 41-43.

In response, Nemours argues that, although *Brittingham,* decided in 2002, still is good law, more recent decisions make it clear that *Brittingham* is "to be a factor in evaluating the reasonableness and necessity of treatment, rather than a bright-line rule permitting claimants to choose their own course of treatment with complete disregard of the established Guidelines."[96] Nemours contends that here it is clear that Cline "jumped over" more conservative care options in an effort to return to work as soon as possible, but, because she did not exhaust those conservative care options, the Board acted within its legal authority in denying her petition for additional compensation.[97] Further, the Board's decision was based on substantial evidence in the form of Dr. Schwartz's testimony that Cline's rushed surgery was not reasonable and necessary.[98]

## IV.   STANDARD OF REVIEW

The Board's decision must be affirmed so long as it is supported by substantial evidence and is free from legal error.[99] Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.[100] While a

---

[96] Answering Br. at15-16 (citing *Nobles-Roark v. Burner,* 2020 WL 4344551, at *2 (Del. Super. Ct. July 28, 2020)),  D.I. 14.

[97] *Id.* at 16.

[98] *Id.* at 16-19.

[99] *Conagra/Pilgrim's Pride, Inc. v. Green*, 2008 WL 2429113, at *2 (Del. June 17, 2008).

[100] *Kelley v. Perdue Farms*, 123 A.3d 150, 153 (Del. Super. 2015) (citing *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009)).

preponderance of evidence is not necessary, substantial evidence means "more than a mere scintilla."[101] Questions of law are reviewed *de novo*,[102] but because the Court does not weigh evidence, determine questions of credibility, or make its own factual findings,[103] it must uphold the decision of the Board unless the Court finds that the Board's decision "exceeds the bounds of reason given the circumstances."[104]

## V. DISCUSSION

The portion of the Board's decision entitled "FINDINGS OF FACT AND CONCLUSIONS OF LAW" consists of four paragraphs.[105] It is in this section that the Board sets out the legal standards it applied and the factual basis for its decision. The first paragraph lays out the standard for an injury to be compensable as a work related injury and the party bearing the burden of proof, neither of which are at issue in this appeal.[106] The remainder of the Board's decision is reproduced below.

> When an employee has suffered a compensable injury, the employer is required to pay for reasonable and necessary medical services/treatment causally related to that injury. 19 *Del. C*. §2322. What constitutes "reasonable medical services" for the purposes of Section 2322 is determined by the Board on a case-by-case basis. *See Willey v. State,*

[101] *Breeding v. Contractors-One-Inc*., 549 A.2d 1102, 1104 (Del. 1988).

[102] *Kelley*, 123 A.3d at 152–53 (citing *Vincent v. E. Shore Markets*, 970 A.2d 160, 163 (Del. 2009)).

[103] *Bullock v. K-Mart Corp.*, 1995 WL 339025, at *2 (Del. Super. May 5, 1995) (citing *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66–67 (Del. 1965)).

[104] *Bromwell v. Chrysler LLC*, 2010 WL 4513086, at *3 (Del. Super. Oct. 28, 2010) (quoting *Bolden v. Kraft Foods*, 2005 WL 3526324, at *3 (Del. Dec. 21, 2005)).

[105] *Cline,* No. 1509418 at 9-12.

[106] *Id.* at 9.

Del. Super., C.A. No. 85A-AP-16, Bifferato, J., 1985 WL 189319 at *2 (November 26, 1985). "Whether medical services are necessary and reasonable or whether the expenses are incurred to treat a condition causally related to an industrial accident are purely factual issues within the purview of the Board." *Bullock v. K-Mart Corporation*, Del. Super., C.A. No. 94A-02-002, 1995 WL 339025 at *3 (May 5, 1995).

Based on the entirety of the evidence incorporated herein, the Board finds that proceeding to a total knee replacement surgery without exhausting conservative care was not reasonable or necessary. The Board accepts the medical opinions of Dr. Schwartz over the medical opinions of Dr. Rubano. Dr. Schwartz testified that such a rush to surgery (whether total knee replacement surgery or arthroscopic surgery) would not be compliant with the Practice Guidelines, with the Medicare Guidelines or with the Highmark of Delaware Guidelines. All three guidelines call for exhaustion of conservative treatment and documented limitations. While Practice Guidelines are merely guidelines, the Board finds that Claimant should have pursued some type of conservative treatment first. It may have helped.

Dr. Rubano did present as rushing to a significant surgery. Both doctors testified the X-rays were relatively normal. The MRI report did not identify significant arthritis. Dr. Rubano disputed the MRI report. He testified that when he reviewed the MRI films, he identified moderate to severe arthritis. It is concerning that the diagnostic reports did not identify significant arthritic findings, yet Dr. Rubano represented that there were. The Board would have been interested to have heard Dr. Schwartz's interpretation of the MRI films. Dr. Rubano's incorrect statement in his medical records indicating Claimant had exhausted conservative treatment when she did not, detracted from Dr. Rubano's credibility. His medical records should have supported his opinion that conservative treatment would not have been beneficial.

18

Dr. Schwartz testified that total knee replacement requires severe degenerative joint disease – a finding the medical records did not sufficiently support. The Board appreciates Claimant's need to return to full-duty work but under this set of facts, the Board finds that it was not reasonable or necessary to rush to undergo a total knee replacement surgery. The Board denies Claimant's Petition for Additional Compensation.[107]

## A. The Board's Decision Was Not Free From Legal Error.

In pressing her argument that the Board committed legal error or abused its discretion, Cline first contends that the Board failed to correctly apply the Delaware Supreme Court's decision in *Brittingham*.[108] In *Brittingham,* the claimant sustained a compensable injury to her cervical spine during the course of her employment at St. Michael's Rectory.[109] Brittingham sought treatment from a board certified neurosurgeon who recommended cervical fusion surgery.[110] She declined the surgery because years before she had undergone neck surgery and did not want to undergo similar surgery again.[111] She attempted physical therapy, but discontinued it when she could no longer tolerate the pain and continued with pain medication.[112] After researching her medical options, Brittingham believed her history of smoking and a diagnosed precursor condition to osteoporosis might affect the outcome of

---

[107] *Id.* at 9-11.
[108] *Brittingham,* 788 A.2d at 520.
[109] *Id.*
[110] *Id.*
[111] *Id.* at 520-21.
[112] *Id.* at 521.

surgery requiring bone harvesting for fusion, such as the proposed surgery.[113]  At her employer's request, she consulted with a board certified orthopedic surgeon who specialized in spinal surgery as well as a neurosurgeon she chose.[114]  She determined her options were two types of fusion surgery using different approaches or no surgery with treatments to help her cope with her injury.[115]  She elected not to have surgery and, as a result, her employer ultimately sought to terminate her total disability benefits.[116]  It alleged that Brittingham had unreasonably refused to undergo surgery and her refusal was the cause of her ongoing disability.[117]  The Board determined that Brittingham had forfeited her right to total compensation by refusing to undergo reasonable surgery.[118]  The Superior Court affirmed on appeal.[119]

Resolving a split in Superior Court opinions regarding a claimant's refusal of medical treatment so as to forfeit compensation benefits, the Delaware Supreme Court reversed.[120]  It found that the record in Brittingham's case reflected the complexity of variables that had to be factored into determining the reasonableness of Brittingham's refusal to have surgery.[121]  First was that the recommended surgical

---

[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.* at 522.
[119] *Id.*
[120] *Id.* at 522-23.
[121] *Id.* at 524.

procedure was major.[122]  Second was Brittingham's physical condition as a smoker

with a precursor condition to osteoporosis.[123]  Third, the risks of surgery were

significant.[124]  Fourth, although all three surgeons predicted a high rate of success,

their perspective on a low risk of serious injury or death might be different from the

person undergoing the surgery.[125] Fifth, Brittingham was not pleased with the results

of a prior surgical experience.[126]  Finally, two doctors, one from each side,  who

appeared before the Board testified that it would be reasonable for Brittingham to

decline the surgery.[127]  Accordingly, the Supreme Court held that the reasonableness

of Brittingham's refusal of her employer's offer of reasonable medical care must be

considered by the Board.[128]  It was error to interpret the term "reasonable medical

treatment" objectively based on the treatment, and not subjectively based on the

claimant.[129]  The Board "must determine whether the treatment is reasonable for the

specific claimant and not whether the treatment is reasonable generally for anyone

with the claimant's condition."[130]

---

[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.* at 525.
[126] *Id.*
[127] *Id.*
[128] *Id.* at 522.
[129] *Id.* at 523.
[130] *Id.*

Six years after *Brittingham* was decided, the Guidelines were adopted.[131] "Services rendered by any health-care provider certified to provide treatment services for employees shall be presumed, in the absence of contrary evidence, to be reasonable and necessary if such treatment and/or services conform to the most current version of the Delaware health-care practice guidelines."[132] With respect to knee replacement surgery, such surgery is reasonable when there is "severe osteoarthritis and all reasonable conservative measures have been exhausted and other reasonable surgical options have been considered."[133]

*Brittingham* and the Guidelines are not in conflict, and, as Nemours acknowledges, *Brittingham* still is good law.[134] Consistent with *Brittingham*, then, in making its factual determination as to the necessity and reasonableness of Cline's surgery, it is incumbent upon the Board to consider whether "all reasonable conservative measures have been exhausted" as to Cline's treatment specifically, and not generally for anyone in her position.

In the three relevant paragraphs of its Finding of Facts and Conclusions of Law, the Board did not expressly apply that standard.[135] At best, it alluded to a requirement that it make its determination on a case-by-case basis, citing a case that

---

[131] Answering Br. at 14, D.I. 14.
[132] 19 *Del. C.* § 2322C(6).
[133] 19 *Del. Admin. C.* § 1342-7.4.5.
[134] Answering Br. at 15, D.I. 14.
[135] *Cline,* No. 1509418, at 9-11.

was decided seventeen years before *Brittingham*.[136] The only apparent consideration the Board gave to Cline's individual circumstances are three brief mentions at the end of its decision.

First, the Board referenced Dr. Schwartz's testimony that the "rush to surgery" was not compliant with various guidelines and found that "[Cline] should have pursued some type of conservative treatment first. It may have helped."[137] Left unsaid was any discussion of the conservative care Cline did receive – time, rest, anti-inflammatory medication, and light therapeutic exercises. Also left unsaid was any finding as to what type of additional conservative treatment specifically Cline should have pursued or how that treatment might have helped her. A subjective assessment of Cline's individual care would have taken those considerations into account. Perhaps the Board did do that, but its broad statement that "some type of conservative treatment" "may have helped" does not convince the Court that it did.

Then, the Board noted that Dr. Schwartz testified that the medical records (presumably the X-ray and MRI reports) did not sufficiently support a diagnosis of severe degenerative disease. At the same time, it stated that it would have been interested in his interpretation of the actual MRI films. The Board did not explain why it apparently was willing to discount Dr. Rubano's testimony about what the

---

[136] *Id.* at 9-10.
[137] *Id.* at 10.

actual films showed without having its interest in Dr. Schwartz's interpretation of those films satisfied.

Finally, almost as an afterthought at the very end of its decision, the Board writes that it "appreciates [Cline's] need to timely return to full-duty work but under this set of facts, the Board finds that it was not reasonable to rush to undergo a total knee replacement surgery."[138]  The Board did not explain how, or even if, it considered Cline's pressing need to return to full-duty work in its evaluation of the reasonableness of her surgery.

These three references, expressed in conclusory terms, are insufficient to convince the Court that the Board examined Cline's case subjectively.  For example, there is no indication in its decision that the Board considered Cline's unsuccessful conservative treatment, consisting of at-home exercises, rest, icing her knee, and taking anti-inflammatory medication for weeks before her surgery, in determining whether she had exhausted all reasonable conservative measures.  Nor did it appear to consider Cline's testimony that light therapeutic exercises only increased her pain. The Board did not discuss what effect, if any, Cline's  testimony that she was unable to stand for prolonged periods, sat when cooking, washing dishes, and showering, limited her driving to 30 minutes, and stayed on the first floor of her house because she was unable to use the stairs in considering her limitations and the reasonableness

---

[138] *Cline,* No. 1509418, at 10-11.

and necessity of her surgery.  Additionally, the Board did not discuss Cline's unsuccessful attempt to return to work when her knee started to collapse or why it discounted Cline's need to return to work.  It simply said in accepting the medical testimony of Dr. Schwartz over that of Dr. Rubano that the "rush to surgery…was not compliant with the Practice Guidelines, with the Medicare Guidelines or with the Highmark of Delaware Guideline."[139]

Moreover, the Court is not confident that the Board correctly applied the Guidelines.  In order to find that the Board properly applied the Guidelines it must find that the Board understood the Guidelines to require the exhaustion of all *reasonable* conservative treatment.  The Board wrote in its decision that the Guidelines "call for exhaustion of conservative treatment and documented limitations."[140]  In fact, the Guidelines do not call for the exhaustion of *all* conservative measures, but only for the exhaustion of all *reasonable* conservative measures. Perhaps the difference is semantical and of no significance, but perhaps not.  An excerpt from Dr. Rubano's cross-examination brings this point into focus:

> Q. So your operative note referencing an exhaustion of conservative treatment is inaccurate; is that fair?
>
> A. In this case I think the likelihood of other conservative measures working was very low.  So in this case I think the conservative measures of giving it time

---

[139] *Id.* at 10.
[140] *Id.*

and taking off of work and anti-inflammatories, those, I believe were appropriate measures that were exhausted.

In my opinion, proceeding with the other conservative options, I don't think they would have been successful.

Q. Doctor, I appreciate your opinion, Doctor, but I'm just talking about your note that she had exhausted conservative treatments. Did you prescribe physical therapy?

A. No.

Q. Okay. So is it fair to say that the universe of conservative therapy had not been exhausted at the time of the operation; is that fair?

A. That's correct.[141]

A reasonable interpretation of Dr. Rubano's testimony is that he viewed all *reasonable* conservative measures to have been exhausted since he did not think other methods would work. Clearly, he did not exhaust the universe conservative measures. So, when he referenced conservative measures being exhausted in his operative note, was he referring to *reasonable* conservative measures? In other words, was he using "conservative measures" as shorthand for "reasonable conservative measures"? The Board wrote that the Guidelines called for the "exhaustion of conservative treatment." When it used that phrase, did the Board mean that the Guidelines called for the exhaustion of all *reasonable* conservative

---

[141] Dr. Rubano Tr. at 37:8–38:7, App. to Op. Br. at A-12, D.I. 13.

treatment?  If so, why was Dr. Rubano's note not given the same interpretation by the Board – that Cline exhausted all conservative treatment that was reasonable in his opinion?  It is not clear.  The Board's failure to discuss the conservative treatment Cline did pursue and why that treatment did not exhaust all reasonable conservative treatment leaves the issue of whether the Board properly applied the Guidelines in doubt.

Given all of the above, the Court cannot be confident that the Board applied the correct standard in determining whether Cline had exhausted all reasonable conservative treatment.  In particular, the Court is not confident that the Board made a subjective determination as to whether Cline exhausted all reasonable conservative treatment suitable for her specifically, or whether it made an objective determination as to treatment for people in her situation generally.  Further, the Court is not confident that the Board properly applied the Guidelines.

**B**. **The Board's Factual Determination Was Not  Supported By Substantial Evidence.**

The Court's role on appeal is not to re-weigh the evidence and decide whether the Board reached the correct decision.  Instead, it is to decide whether there was substantial evidence to support the Board's decision and whether that decision was free from legal error.  But, when the Board applies the wrong standard for determining the reasonableness and necessity of Cline's total knee replacement, it runs the risk of failing to identify the substantial evidence supporting its decision.

After listening to the evidence, the Board found Dr. Schwartz's medical testimony more credible than Dr. Rubano's testimony, which, of course, was within its province to do. The problem for the Court on appeal is that the Board couched its decision in such a conclusory fashion, that the Court is unable to identify the specific facts it relied upon in deciding that Cline's surgery was not necessary and reasonable. The Board stated, "Based on the entirety of the evidence incorporated herein, the Board finds that proceeding to total knee replacement surgery without exhausting conservative care was not reasonable or necessary.[142] No specific facts were offered in support of that conclusion. Instead, the Board simply cited Dr. Schwartz's testimony that the "rush to surgery" did not comply with various guidelines.[143] This Court is tasked with determining whether the Board's decision is supported by substantial evidence. Rather than send the Court on a search of the "entirety of the record" looking for substantial evidence, it would have been helpful if the Board had undertaken that effort itself.

Similarly, the Board resolved the dispute between the doctors over the extent of Cline's arthritis by discrediting Dr. Rubano's reading of the actual MRI films in favor of Dr. Schwartz's testimony concerning an interpretive report of those films.[144] It did so despite being "interested" in hearing Dr. Schwartz's interpretation of the

---

[142] *Cline*, No. 1509418, at 10.
[143] *Id.*
[144] *Id.*

28

films.[145]  The Board did not comment, either in its Summary of the Evidence or in its Findings of Fact, on Dr. Rubano's surgical observation that:

> [Cline] had advanced arthritis up underneath the kneecap, certainly worse than the report states.  And then changes, significant changes on the medial and lateral compartments that would certainly justify the pain she was in.  And not only proceeding with knee replacement, but further, in my mind, confirming that an arthroscopic procedure would not have addressed her problem.[146]

The Board explained that it favored Dr. Schwartz's reading of the MRI report over Dr. Rubano's interpretation of the actual MRI films and his surgical observations because of what it found to be an "incorrect" statement in Dr. Rubano's medical records regarding exhaustion of conservative care.[147]  But, interpreting diagnostic films and making surgical observations are different than making an arguably "incorrect" statement in a medical record.  Concluding that Dr. Rubano's actual observations are to be discounted, especially when there is no on-point contradictory testimony, on the basis of the Board's interpretation of a comment Dr. Rubano made in his medical records regarding exhaustion of conservative care is curious.[148]  In the Court's view, a better explanation is required.

---

[145] *Id.*

[146] Dr. Rubano Tr. at 22:22-23:8, App. to Op. Br. at A-8, D.I. 13.

[147]*Cline,* No. 1509418, at 10.

[148] See the Court's discussion of Dr. Rubano's testimony regarding exhaustion of conservative treatment, *supra.*

There may be substantial evidence in the record to support the Board's decision, but the Board failed to identify that evidence sufficiently and explain why it supports the Board's decision. Accordingly, the Court cannot conclude that the Board's decision is supported by substantial evidence.

## VI. CONCLUSION

For the foregoing reasons, the Court is unable to conclude that the Board's decision was free from legal error and was supported by substantial evidence. Therefore, the Board's decision is **REVERSED** and **REMANDED** to the Industrial Accident Board for further proceedings consistent with this Opinion.

**IT IS SO ORDERED.**

/s/ Ferris W. Wharton
Ferris W. Wharton, J.